**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| T.F., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-05594-TRJ |
| v. | ) | |
| | ) | |
| WYNDHAM HOTELS & RESORTS, INC. | ) | JURY TRIAL DEMANDED |
| d/b/a DAYS INN BY WYNDHAM, | ) | |
| DAYS INNS WORLDWIDE, INC., AND | ) | |
| KRISHNA Q INVESTMENTS LLC d/b/a | ) | |
| DAYS INN BY WYNDHAM, | ) | |
| | ) | |
| Defendants. | ) | |

# SECOND AMENDED COMPLAINT

Plaintiff T.F. files this Second Amended Complaint against Defendants Wyndham Hotels & Resorts, Inc. d/b/a Days Inn by Wyndham ("Wyndham"), Days Inns Worldwide, Inc. ("Days Inns"), and Krishna Q Investments LLC d/b/a Days Inn by Wyndham ("Krishna Q") (collectively, "Defendants").

Plaintiff was sold as a child for sex out of a room at the Days Inn by Wyndham at 2451 Old National Parkway in College Park, Georgia. The hotel staff knew Plaintiff's trafficker, took extra cash from him, warned him when police were around, and rented him room after room while a steady line of men came through the lobby to Plaintiff's door.

## INTRODUCTION

1. Plaintiff T.F. is a survivor of sex trafficking under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"), 18 U.S.C. §§ 1591 and 1595.

2. Plaintiff was sold for sex at the Days Inn by Wyndham located at 2451 Old National Parkway, College Park, Georgia 30349 (the "Days Inn" or the "subject hotel") from approximately 2015 through 2019. Defendant Krishna Q owned and operated the subject hotel. Defendant Wyndham branded, franchised, and controlled it.

3. Plaintiff was caused to engage in commercial sex acts at the subject hotel through fraud and coercion, including false promises, psychological and emotional abuse, drugs, the confiscation of her identification, and the withholding of food and hygiene products. Plaintiff was also caused to engage in commercial sex acts before she had attained the age of eighteen years. Defendants benefitted in violation of the TVPRA.

4. Plaintiff brings this action under 18 U.S.C. § 1595 against Defendants, each of which participated in ventures and knowingly benefitted from those ventures. The ventures violated 18 U.S.C. § 1591 because they harbored, maintained, patronized, and/or solicited Plaintiff knowing, or in reckless disregard

of the fact, that means of fraud and coercion were used to cause Plaintiff to engage in commercial sex acts and that Plaintiff had not attained the age of eighteen years. Defendants knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff. Plaintiff also brings claims under 18 U.S.C. § 2255 and Georgia law.

## I. THE PARTIES AND PERSONAL JURISDICTION

### A. Plaintiff

5. Plaintiff T.F. is an individual over the age of majority who resides in the State of Georgia. Plaintiff was born in December of 1997.

6. This Honorable Court has entered an order allowing Plaintiff to proceed under the pseudonym "T.F." in all public filings and proceedings prior to trial. Doc. 26.

7. Plaintiff is a victim of trafficking as defined by 18 U.S.C. §§ 1591 and 1595. The Plaintiff was trafficked at the subject hotel from approximately 2015 through 2019. The trafficker continued to control Plaintiff until on or around January 2019, when Plaintiff and her trafficker were arrested.

8. Plaintiff was "caused to engage in a commercial sex act" before she attained the age of eighteen years. 18 U.S.C. § 1591(a).

**B. Defendants**

9. Defendant Krishna Q Investments LLC ("Krishna Q") is a Georgia limited liability company with its principal office address at 2451 Old National Parkway, College Park, Georgia 30349. According to the Georgia Secretary of State, Krishna Q may be served through its registered agent, Nimesh Bhagat, 2480 Old National Parkway, College Park, Georgia 30349. However, upon information and belief, the listed registered agent Nimesh Bhagat is a citizen of the State of California, having an address in Yorba Linda, California.

10. At all times relevant to this action, Krishna Q owned, operated, managed, and supervised the subject hotel, which it operated as a Days Inn by Wyndham pursuant to a franchise agreement with Wyndham's wholly owned subsidiary, Days Inns Worldwide, Inc.

11. Defendant Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its principal place of business at 22 Sylvan Way, Parsippany, New Jersey 07054. Wyndham may be served through its registered agent, Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066.

12. Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor.

Where applicable, references to Wyndham in this Complaint include Wyndham Worldwide Corporation.

13. Wyndham owns the Days Inn brand and franchises it to hotel owners, including Krishna Q, through its wholly owned subsidiaries, including Defendant Days Inns Worldwide, Inc. and Wyndham Hotel Group, LLC. Wyndham controls those subsidiaries, and they act as its agents in franchising, supervising, and controlling Days Inn hotels. References to Wyndham in this Complaint include those subsidiaries and Defendant Days Inns Worldwide, Inc.

14. Defendant Days Inns Worldwide, Inc. ("Days Inns Worldwide") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey. Days Inns Worldwide may be served through its registered agent, Corporate Creations Network Inc., 2985 Gordy Parkway, 1st Floor, Marietta, GA 30066. This Complaint will refer to both Defendants Wyndham Hotels & Resorts, Inc. and Days Inns Worldwide as "Wyndham".

15. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, subsidiaries, or representatives who was actively engaged in the management,

direction, control, or transaction of the ordinary business and affairs of Wyndham, including Defendant Days Inns Worldwide.

**C. Personal Jurisdiction Over Defendants**

16. The Court may properly exercise personal jurisdiction over all Defendants.

17. Defendant Krishna Q is subject to the jurisdiction of this Court because it is a Georgia limited liability company with its principal office in this District and because, at the time of the events described herein, it owned and operated the subject hotel in College Park, Georgia, where Plaintiff was trafficked. Krishna Q caused injuries to Plaintiff in Georgia and profited from the sex trafficking of Plaintiff at the subject hotel.

18. Defendants Wyndham and Days Inns Worldwide are subject to the jurisdiction of this Court because they regularly conduct business in Georgia, including through the franchising, branding, supervision, and control of numerous hotels in Georgia, such as the subject hotel; contract to supply services in Georgia; maintain a registered agent in Georgia; and have derived substantial revenue from services rendered in Georgia. Defendants Wyndham and Days Inns Worldwide caused injuries to Plaintiff in Georgia and profited from a venture that permitted the trafficker to sell Plaintiff for commercial sex at the subject hotel.

## II. SUBJECT MATTER JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, namely 18 U.S.C. §§ 1595 and 2255.

20. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a) because it is so related to the federal claims that it forms part of the same case or controversy.

21. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred at the subject hotel in College Park, Fulton County, Georgia.

## III. PLAINTIFF'S SEX TRAFFICKING

### A. Trafficker Targeted Plaintiff When She Was a Vulnerable Child.

22. Before she met her trafficker, Plaintiff was a minor living with her grandmother.

23. Plaintiff met her trafficker when she was only fifteen, and he began grooming her. The trafficker began forcing her to engage in commercial sex when she was only 17.

24. Plaintiff's trafficker was already trafficking other girls and young women at that time in addition to selling drugs. He targeted Plaintiff and groomed her. He made her feel special. He promised to make her life better. He gave her gifts.

25. Once her trafficker had gained Plaintiff's trust, he caused her to engage in commercial sex acts for his profit. The trafficker kept Plaintiff close to him and treated her as his girlfriend even while he caused her to engage in commercial sex.

**Trafficker Used Fraud and Coercion to Cause Plaintiff to Engage in Commercial Sex Acts.**

26. The trafficker used psychological and emotional abuse to break Plaintiff and his other victims down and keep them compliant.

27. The trafficker kept Plaintiff intoxicated. He supplied her with alcohol, MDMA, and ecstasy pills, and used her intoxication to control her. Sex buyers also tried to make Plaintiff use drugs.

28. The trafficker took Plaintiff's identification documents.

29. The trafficker withheld food and hygiene products from Plaintiff and the other girls to ensure that they did what he demanded. Plaintiff became malnourished and sleep deprived.

30. The trafficker kept Plaintiff and the other girls under constant surveillance. Even when he was not physically with them, he knew where they were and what they were doing.

31. The trafficker controlled approximately five girls and young women, including Plaintiff. He had trafficked girls and young women for a long time before he met Plaintiff, upon information and belief, including at the subject hotel.

32. When the trafficker had confrontations with the girls he controlled, he took them into his car in the subject hotel's parking lot, on hotel property and in view of the hotel.

33. The trafficker kept Plaintiff and the other girls together in a single hotel room. When one girl was with a sex buyer, the trafficker and the other girls waited in his car in the hotel parking lot, and the girls rotated in this manner throughout the day.

34. The trafficker forced Plaintiff to find sex buyers by walking the street near the subject hotel and approaching men in the subject hotel's parking lot, while the trafficker or those working for him watched. Approximately ten men per day came to the room to purchase sex.

35. Because of the trafficker's manipulation and control, and because hotel staff ignored her obvious distress, Plaintiff did not believe she could ask

anyone for help.

**Trafficker Trafficked Plaintiff at the Subject Hotel.**

36. From approximately 2015 through 2019, the trafficker forced Plaintiff to engage in commercial sex at the subject hotel.

37. The trafficker, the Plaintiff, and the other victims stayed at the subject hotel approximately two nights at a time, with a day or two off in between for years. They stayed overnight. They often arrived late at night and at times during the day.

38. The trafficker rented the room one night at a time and renewed it day after day. The Plaintiff was present with the trafficker when he renewed the room.

39. The trafficker booked rooms both in person at the front desk and in advance through a website and paid with both cash and a card.

40. During her captivity at the subject hotel, Plaintiff was raped, verbally abused, malnourished, psychologically tormented, kidnapped, and imprisoned in connection with the sex trafficking venture at the subject hotel.

**IV. DEFENDANTS PARTICIPATED IN VENTURES.**

41. Defendant Krishna Q participated in a hotel operating venture with Wyndham and others. The venture owned, supervised, operated, managed, and branded the subject hotel as a Days Inn by Wyndham.

42. As part of the venture, Krishna Q owned and operated the subject hotel. Krishna Q paid Wyndham royalty fees, a percentage of the hotel's gross room revenues, in addition to other fees in exchange for the right to use the Days Inn brand and operate as a Days Inn.

43. As part of the venture, Wyndham licensed the Days Inn brand to Krishna Q; set and enforced the standards under which the subject hotel operated; provided the reservation, distribution, and property management systems through which rooms at the subject hotel were booked; tracked online reviews; inspected the hotel; and collected a share of the revenue from every room rented at the subject hotel, including the rooms in which Plaintiff was trafficked.

44. The venture also included the owners, managers, and staff of the subject hotel, including, but not limited to, the front desk staff, housekeeping and janitorial staff, maintenance workers, and managers.

45. Krishna Q had both a continuous business relationship and a direct association with the trafficker, in which it rented rooms to the trafficker, whom it knew or should have known was engaged in sex trafficking.

46. Krishna Q was closely involved in the daily management of the subject hotel. The staff present at the hotel dealt with the trafficker directly. The owners of Krishna Q were present at the hotel regularly and also interacted with

the trafficker.

47. Plaintiff exhibited obvious signs of being sex trafficked, as described more fully in paragraphs 57 through 59. In summary, Plaintiff was visibly a child; she, along with other young women, came and went with an adult man who controlled them; she was intoxicated, hungry, and sleep deprived; she dressed provocatively; she met a steady procession of men in the hotel lobby; and she came to the front desk for clean towels and soap after being forced to engage in commercial sex.

48. Krishna Q aided the trafficker, including in the following ways:

a. Krishna Q's staff were friendly with the trafficker and comfortable with him, as with a regular customer. Upon information and belief, he had trafficked girls at the subject hotel before Plaintiff.

b. Krishna Q's staff let Plaintiff into the room when she did not have a keycard on more than one occasion.

c. Upon information and belief, Krishna Q's staff would prop open the locked exit doors to the exterior of the building. Commercial sex buyers would enter the subject hotel through these propped open doors at times. Plaintiff did not prop open the doors, and she never witnessed her trafficker do so.

d. Krishna Q's staff accepted extra cash from the trafficker for their silence. The trafficker would pay the staff more money than the cost of the room to rent. Plaintiff witnessed these payments.

e. Krishna Q's staff warned the trafficker about police activity.

f. Krishna Q's staff assigned the trafficker rooms toward the back of the hotel near the exits.

g. Krishna Q's staff never asked Plaintiff for identification, even though she was visibly a child and, upon information and belief, was at times listed as a guest in the trafficker's room.

h. Krishna Q's housekeeping staff entered the rooms, saw sex-work clothing there and unused and used condoms, and knew not to bother certain items.

i. Krishna Q never tried to evict the trafficker, Plaintiff, or the other girls, and allowed them to continue engaging in commercial sex.

49. Krishna Q continually decided to renew its business relationship with the trafficker. The trafficker typically rented the room by the day and would make the Plaintiff and his other victims stay at the subject hotel on average two consecutive nights. The trafficker and his victims would then check out and return one or two days later. They would then stay another two consecutive nights. This

pattern persisted for years.

## V. DEFENDANTS KNOWINGLY BENEFITTED FROM THE VENTURES.

50. Krishna Q knowingly benefitted from the ventures because it knowingly received payment, in cash and by card, every time it rented or renewed a room for the trafficker, including the payments above the posted room rate.

51. Wyndham knowingly benefitted from the ventures because it received royalties and fees, including revenue from the rooms in which Plaintiff was trafficked. Wyndham also charged fees for reservations processed through websites and third-party distribution channels and jointly owned all information captured through the hotel's property management system, including guest and stay information. Upon information and belief, Wyndham received such fees and data from the reservations the trafficker made through booking online.

52. Defendants knowingly benefitted from the ventures by keeping operating costs low instead of taking reasonable steps to detect, identify, and eradicate sex trafficking at the subject hotel. Defendants reduced costs by:

a. limiting the training that managers and employees received on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b. ignoring and refusing to act on information, including customer reviews and police activity, indicating that sex trafficking was occurring at the subject hotel;

c. failing to use the data they collected to combat sex trafficking at the subject hotel; and

d. failing to employ appropriate security measures to combat human trafficking and sexual exploitation.

53. Defendants also received other things of value from the ventures, including continued room occupancy, goodwill, and the maintenance of a positive public image for the subject hotel.

**VI. THE VENTURES VIOLATED 18 U.S.C. § 1591.**

54. When the trafficker brought Plaintiff to the subject hotel, the ventures described in paragraphs 41 through 49 knowingly harbored, maintained, patronized, and/or solicited Plaintiff.

55. The ventures did so knowing, or in reckless disregard of the fact, that means of fraud, coercion, or a combination of such means would be used to cause Plaintiff to engage in commercial sex acts, and knowing, or in reckless disregard of the fact, that Plaintiff had not attained the age of eighteen years and would be caused to engage in commercial sex acts.

**A. Krishna Q Rented Rooms That Harbored and Maintained Plaintiff.**

56. Krishna Q and its managers, staff, and employees rented rooms to the trafficker in which Plaintiff was kept and sold, and thereby knowingly harbored and maintained Plaintiff.

57. The trafficker frequented the subject hotel. The staff recognized the trafficker and knew Plaintiff was staying in his rented rooms, because:

a. the trafficker and Plaintiff stayed at the subject hotel two days at a time with only a day or two break in between stays over a period of years;
b. the staff were friendly with the trafficker and comfortable with him;
c. the Plaintiff at times stood with trafficker at the front desk when he checked in and when he renewed the room;
d. the Plaintiff went to the front desk herself after engaging in commercial sex for additional towels, washcloths, and soap, and had frequent interactions with the front desk staff; and
e. the Plaintiff met sex buyers in the lobby by the elevator, in full view of the front desk.



58. Krishna Q and its staff knew, or were in reckless disregard of the fact, that Plaintiff was engaging in commercial sex acts at the subject hotel, because:

a. approximately ten men per day, none of them registered guests, came to the single room rented by the trafficker, most of them through the lobby and past the front desk, and some through the exit doors;

b. the Plaintiff often came to the front desk for additional towels, washcloths, and soap after being forced to engage in commercial sex because a standard room had only about two washcloths and about two bath towels;

c. men loitered outside the subject hotel waiting to go inside to purchase sex;

d. Plaintiff wore clothing typical of commercial sex work, including very short shorts and tight dresses, and that clothing was left lying around the room in full view of housekeeping staff;

e. Plaintiff approached men in the subject hotel's parking lot to solicit commercial sex at the trafficker's direction;

f. several young women shared a single room, and took turns waiting in a car in the parking lot while one of them was in the room with a man;

g. the trafficker sold drugs out of the subject hotel;

h. large amounts of condom wrappers and condoms were left in the room after each checkout and were in plain sight of housekeeping staff;

i. loud noise, yelling, and screaming came from the room in which Plaintiff and the other victims were being trafficked at times, loud enough to be heard by staff outside the room;

j. the trafficker rented the room one night at a time and renewed it the next day, and paid more than the room rate; and

k. the staff warned the trafficker about police activity.

59. Krishna Q and its staff also knew, or were in reckless disregard of the fact, that the trafficker was causing Plaintiff to engage in commercial sex acts through fraud and coercion, and that Plaintiff was under the age of eighteen years, because:

a. Plaintiff was visibly a child, accompanied by an adult man who controlled where she went;

b. when the trafficker first brought Plaintiff to the subject hotel, she displayed visible sadness and intimidation, and the staff ignored it;

c. Plaintiff was visibly intoxicated on drugs and alcohol;

d. Plaintiff was visibly hungry and malnourished. A man who worked there told Plaintiff not to eat all of the complimentary food in the lobby and gave her hostile stares;

e. Plaintiff appeared sleep deprived and unwell, and lost a marked amount of weight over the period she was trafficked;

f. Plaintiff had no identification of her own and few personal belongings beyond her purse;

g. Plaintiff was continuously watched, and came and went from the subject hotel only with the trafficker;

h. The trafficker took the girls into his car in the parking lot when he had confrontations with them and these confrontations involved physical abuse at times;

i. The trafficker paid the staff extra for their silence and relied on them to warn him about police;

j. loud noise, yelling, and intermittent screaming came from the room in which Plaintiff and other victims were trafficked at times, loud enough to be heard by staff outside the room; and

k. Plaintiff was in fear of severe bodily injury or death if she did not comply with the trafficker's directives.

60. The individuals who witnessed and observed these signs were the staff of the subject hotel. Plaintiff knows they were staff because she dealt with them at the front desk, because they wore hotel attire or name tags, because they worked in employee-only areas, and because they entered the room to clean it.

## VII. DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT THE VENTURES VIOLATED 18 U.S.C. § 1591(a).

61. Krishna Q knew or was in reckless disregard of the fact that the ventures violated 18 U.S.C. § 1591(a) as to Plaintiff because its staff knew or were in reckless disregard of this fact, as described in paragraphs 54-60. The knowledge

of Krishna Q's managers and staff, acquired within the scope of their agency and employment, is imputed to Krishna Q.

62. Upon information and belief, the Defendants tracked guest and visitor movement through RFID keycard systems. Each time a keycard opened a guest room door, an exterior entrance, a stairwell, an elevator, or another controlled exit, the system logged it automatically. These records are time-stamped and tied to a specific card and room, so the Defendants had access to a running account of who entered which room, when, how often, and through which doors they came and went.

63. Because the Defendants, upon information and belief, installed, programmed, maintained, and controlled this system, they cannot credibly say they lacked knowledge of activity their own technology records.

64. Patterns that point to trafficking or other illicit activity showed up plainly in the data: many entries into one room within short periods, repeated access at unusual hours, frequent keycard reissuance, and steady traffic through side or rear exits instead of the main lobby.

65. Upon information and belief, Wyndham and/or Krishna Q had this information at their fingertips. They therefore knew, or in the exercise of reasonable care should have known, about the activity in and around Plaintiff's

rooms at at any given time. A Defendant that collects this data and chooses not to review it, or reviews it and does nothing, has not escaped notice. It has ignored it.

**A. Sex Trafficking at Hotels Was a Known and Widespread Problem.**

66. Defendants knew or should have known that sex trafficking was a widespread problem in the hospitality industry and that a significant portion of sex trafficking in the United States occurs at hotels and motels.

67. The hospitality industry is a major life source of the human trafficking epidemic both in the United States and abroad.[1] The United Nations,[2] international

[1]Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[2]Global Report on Trafficking in Persons, United Nations Office on Drugs and Crime (2020), available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; see also We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners, United Nations Office on Drugs and Crime (Apr. 24, 2012), available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html.

[3]The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

non-profits,[3] and the U.S. Department of Homeland Security[4] have documented this well-known epidemic for years and have brought particular attention to the indispensable role of hotels.

68. In 2004, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct in the United States, identifying steps companies should take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices, including: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex advertisements for the hotel's name and pictures of its rooms; (4) changing Wi-Fi passwords regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; and (7) requiring all visitors to be logged, including guest name, visitor name, arrival and departure times, and room number.

---

[3]The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[4]Human Trafficking and the Hospitality Industry, U.S. Department of Homeland Security (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. Department of Homeland Security (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

69. Nationwide campaigns recognized the issue of human trafficking in the hotel industry, and the lack of internal policies to address it domestically in 2010 with the Department of Homeland Security's Blue Campaign.[5] The campaign released free online resources and toolkits for the hospitality industry.

70. The passage of the Trafficking Victims Protection Act in 2000 and the TVPRA in 2008, together with numerous other legislative initiatives, put Defendants on notice of the high likelihood of sex trafficking at their hotels. By 2012, training guides and videos were available through the American Hotel & Lodging Association and ECPAT-USA, among others.

71. Defendants knew or should have known that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence and substance abuse, and that the relationship between a trafficker and a trafficking victim involves force, fraud, and coercion.

72. Before and during the relevant period, Defendants failed to implement sufficient educational and training programs on sex trafficking within their chain of command, and failed to implement policies for preventing, identifying, reporting, documenting, investigating, and stopping sex trafficking at the subject hotel.

---

[5] DHS Blue Campaign Five Year Milestone, U.S. Department of Homeland Security (July 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

**B. Krishna Q staff or owner lived at the subject hotel.**

73. At least one Krishna Q staff or owner lived at the subject hotel.

**C. Online Reviews Reported Prostitution, Pimps, and Drug Activity at the Subject Hotel.**

74. Defendants knew or should have known of sex trafficking, prostitution, and other illicit activity at the subject hotel through online review websites such as Tripadvisor. Reviews of the subject hotel, listed as "Days Inn by Wyndham College Park Airport Best Road," reported the pervasiveness of prostitution, pimps, drug dealing, and other criminal activity there, including reviews titled or describing the following:

a. In November 2012, a reviewer wrote: reporting drugs and criminal activity;

**Jordan F** wrote a review Nov 2012
Phoenix, Arizona • 3 contributions • 6 helpful votes

**I give this property 5 stars for LOCATION because that's...**

I give this property 5 stars for LOCATION because that's the mainstay of this hotel; all other features were quite unsatisfactory. Rick the shuttle driver was exceedingly friendly and took his airport and hotel shuttle route very seriously. We were able to go to and from the hotel and ATL-Hartsfield Airport with ease and for FREE! The hotel itself was sadly quite an eyesore from all angles. If this property earned the "CHAIRMAN'S AWARD" then I am truly terrified what a "normal" Days Inn looks like. The only thing that is deserving of an "award" at this Days Inn is the free and frequent shuttle service to ATL & MARTA and the physical proximity to the airport. If you're stranded at ATL, you can't do much better for $42 a night if a good night's sleep and a complimentary shuttle service to the airport is all you require. The rooms are worn and outdated and there was evidence of knife sharpening or other hunting/criminal activity in our room. The shower was dirty and the bathroom ceiling vent harbored prehistoric bacteria and yeast colonies. The absence of interior corridors is standard for hotels such as these but in such cases, additional door locks are usually provided. There is no way to deadbolt these doors when you are inside your room. The breakfast was a selection of highly nutritious institutional food akin to what you would expect at a state prison but the other diners' satisfaction with white bread toast and worse-than-gas-station, generic coffee and powdered creamer was fitting since most of the other guests looked like products of the federal penal system. All in all, don't expect much. The rooms are as basic as it gets: no luxuries whatsoever, outdated rooms and dirty showers, simple shelter that many illegal immigrants and drug smugglers called their gateway to the USA...The breakfast is commensurate with something you would see in the waiting room of a sleezy auto repair shop. If you're short on cash but abounding in time, enjoy the view of incoming jets on final approach to ATL: they land DIRECTLY over the hotel!

Read less

Value Rooms Location

Cleanliness Service Sleep Quality

Date of stay: **November 2012**
Trip type: **Traveled as a couple**

b. In March 2015, a reviewer wrote: "My stay at Days Inn - Awful Experience", reporting drug users on the property, including a woman rocking back and forth as if in agony;

Review of **Days Inn by Wyndham College Park Airport Best Road**

**SoloTraveller653** wrote a review Mar 2015

London, United Kingdom • 18 contributions • 16 helpful votes

●○○○○

**My stay at Days Inn - Awful Experience**

I stayed at the Days Inn, Best Road (more like WORST MIGHTMARE)!!!!!!!! as a stopover to the Caribbean. The online photos seemed ok but then they would as they are those put up by the Management (look at the travellers photos and you get the right idea). The hotel is close to the airport (less than a 10 minute drive). We were dropped off at Reception and were booked in and given our keys. We trudged across to the rooms located on the other side of the complex in the cold and rain following a 9 hour flight and tried to enter the rooms using the keys. They didn't work and we had to trudge back to Reception with our cases as we didn't want to leave them outside the rooms. We were given another set of keys which also didn't work. 3 times we went back to Reception to get the keys activated. The guy on reception called someone from maintenance to meet us and let us in. Eventually the keys worked and we were shown our rooms.. The first thing that hit you was the smell and the state of the room. My gut reaction was "what the hell is that smell and why is the room so dirty". The man said that we were in a smoking room. The company we booked through (Booking.com) had put us in smoking rooms without asking. Needless to say I was very unhappy, we went back to reception and our rooms were changed. The replacement rooms were dark, dingy, dirty, musty and cold. The fridge was unplugged and dirty, I was scared to use the heater in the room in case it blew up so slept in the cold. The sheets on the bed left a lot to be desired and were also filthy I was afraid to change into night clothes so slept in the clothes I arrived in. The area was very dubious indeed as well as some of the clientele. There were what looked like "crack heads" wandering/staying in the hotel and whilst we were there I could hear the man on reception actually warning someone not to bring the police back to the hotel. I was never so scared in my life.... On our way back to our rooms there were a few people roaming around, some shouting and another looked as if he had been let out of some kind of institution that night. At breakfast we encountered a woman who was rocking back and forth as if she was in agony. Either that or she was itching for her next fix as she was trembling and wailing quite a lot. I was scared to make eye contact so quickly threw the breakfast down my throat and literally jumped onto the first shuttle bus out of there to the airport at 6.30 am so that I didn't have to spend another minute there - it was the worst and scariest experience of my life. The photos are clearly old and must have been done when the hotel first opened as it looks nothing like the photos do now.

I would never recommend this hotel and would never go back there. I was even willing to leave and find another hotel and pay well and truly over the odds for decent surroundings. The place is an absolute hovel......

Read less ^

c. In March 2016, a reviewer wrote: "Unsafe in many ways... Stay Away!!!!", reporting pimps and prostitutes at the hotel;

Review of **Days Inn by Wyndham College Park Airport Best Road**

**JPX** wrote a review Mar 2016

Santa Rosa Beach, Florida • 57 contributions • 34 helpful votes



●○○○○

**Unsafe in many ways... Stay Away!!!!**

It was a night of terror. This place is reserved for pimps and prostitutes. The guy that checked in in front of me had a bodyguard that tattoos from top to toes, pants down to his knees and pull out a walmart bag full of cash. The whole night, we couldn't sleep because there were ladies walking outside on their stiletto with those guys in and out of the room next to mine. I can't believe I actually laid down on that bed. We were scared for our safety that night.

The place was a total dump, the ceiling is falling apart. Electricities are wired from one building to another using a long extension cord (what kinda building code is this? Who inspected this place).

d. In July 2019, a reviewer wrote: "Nauseating Place to stay", reporting that the reviewer was propositioned by a prostitute and a drug dealer; and

Review of **Days Inn by Wyndham College Park Airport Best Road**

**nstoerne** wrote a review Jul 2019
2 contributions • 2 helpful votes

**Nauseating Place to stay**

I would not recommend this place to anyone other than recommend they stay somewhere else. The rooms were disgusting and dirty. My friend was propositioned by a prostitute and drug dealer on the property.

**Value** **Rooms** **Location**

**Cleanliness** **Service** **Sleep Quality**

Date of stay: **July 2019**
Trip type: **Traveled with family**

e. In May 2021, a reviewer wrote: "Horrible hotel", reporting drugs and prostitution involving minors.



Review of **Days Inn by Wyndham College Park Airport Best Road**

**799unsatisfied** wrote a review May 2021

1 contribution

**Horrible hotel**

This place allows drugs and prostitution with minors. Rooms extremely dirty.Staff unprofessional Mr.Patel was extremely RUDE. Someone from corporate needs to go that hotel.Everthing was outdated ROOMS HAD A HORRIBLE SMELL

**Value** **Rooms** **Location**

**Cleanliness** **Service** **Sleep Quality**

Date of stay: **March 2021**

Trip type: **Traveled on business**

75. Wyndham reserved the right in the Franchise Agreement to act on complaints about the subject hotel, including those posted on third party websites, conducted electronic guest satisfaction surveys, and tied remedial training to guest survey results and complaints.

76. Upon information and belief, Wyndham monitored online reviews, guest complaints, and guest satisfaction surveys for the subject hotel and used that information to measure and enforce its System Standards. Wyndham therefore knew or should have known of the reviews described in paragraph 74.

77. Defendants knew of the reviews described in paragraph 74. Had they used reasonable care and diligence, they would have investigated the reviews and discovered that the ventures were violating the TVPRA.

**D. Police Were Repeatedly Called to the Subject Hotel.**

78. College Park Police Department records reflect repeated calls for police service to the subject hotel's address at 2451 Old National Parkway. From 2011 through the end of 2015, the College Park police reported at least 157 incidents at the subject hotel. This included at least four loitering for illegal sexual purposes calls; at least one underage runaway; at least twelve drug related calls; and at least seven battery and sexual assault calls. Upon information and belief, this pattern continued throughout Plaintiff's trafficking at the subject hotel.

79. Defendants knew or should have known of this police activity. Krishna Q's staff not only knew of it but used it to warn the trafficker.

**E. Defendants Should Have Noticed the Signs of Trafficking.**

80. Defendants knew or should have known that the ventures violated the TVPRA because the subject hotel's staff noticed, or should have noticed:

a. that the trafficker, the Plaintiff, and the other victims stayed at the subject hotel far more often than is the norm for local guests, with very few personal possessions;

b. that, upon information and belief, every time the trafficker checked in and renewed a room rental, that rental or renewal was entered into Wyndham's property management system, Wyndham's system

recorded the one-night rental and renewal pattern for years.

c. that Plaintiff was a minor in the company of an adult man and was never asked for identification;

d. that unregistered men continuously came to and from the room;

e. that Plaintiff was being forced to solicit men in the parking lot;

f. that the trafficker paid more than the room rate, in cash and by card, and renewed the room one night at a time;

g. that Plaintiff asked for additional towels, washcloths, and soap after men visited her room;

h. that Plaintiff showed signs of malnourishment, poor hygiene, sleep deprivation, and intoxication;

i. that Plaintiff was dressed provocatively and inappropriately for her age;

j. that Plaintiff was continuously monitored and appeared anxious and fearful;

k. that Plaintiff had no money of her own and no identification; and

l. that the trafficker would have altercations with the Plaintiff and his other victims in the car in the parking lot.

## VIII. WYNDHAM IS VICARIOUSLY LIABLE BECAUSE KRISHNA Q WAS WYNDHAM'S AGENT.

81. Krishna Q operated the subject hotel as Wyndham's actual agent. Wyndham did not merely license its name. It retained and exercised control over the day-to-day operation of the subject hotel, including the very policies, practices, and systems through which rooms were reserved, rented, paid for, and recorded, staff were trained, and guest complaints were handled, all of which were the means by which the trafficker obtained rooms and Plaintiff was harbored and sold.

### Wyndham Controlled the Subject Hotel.

82. Wyndham reserved control over the manner in which the subject hotel was operated day-to-day, including the following:

a. Wyndham calls its Days Inn network of hotels, the "System." Wyndham agreed that it would control and create the requirements for its System Standards and reserved the right to change the System Standards. Wyndham required Krishna Q to follow Wyndham's strict rules dictating how Krishna Q marketed the hotel, operated the hotel, the technology it used, and maintenance. Wyndham also controlled Krishna Q's cleanliness, housekeeping, repairs, food and beverages, uniforms, staffing, training, and guest comfort.

b. Prior to using the Days Inn name, a Wyndham agent inspected the subject hotel.

c. Based on this inspection, Wyndham required Krishna Q to make certain specific improvements to the subject hotel. These included, but are not limited to, pressure-washing the exterior of the building, sidewalks, and pool deck, weeding the pool deck, fixing the fogged appearance of the windows, repainting the faded porch roof, installing a vanity mirror in the public restrooms, taking the tv off of an armoire and mounting it on a corner wall mount, replacing the breakfast area seating and tables, and replacing lamps so the lamps were matching.

d. Wyndham prohibited Krishna Q from sharing its front desk, telephones, parking lot, and swimming pool with any other hotels.

e. Wyndham required Krishna Q to operate the hotel in accordance with the System Standards and dictated that any breach of such standards was a material breach of their agreement.

f. Wyndham required Krishna Q and the hotel's general manager to attend Wyndham's mandatory training, and Wyndham required Krishna Q to train its staff in the way Wyndham required when Wyndham required it. Wyndham could require remedial training for

Krishna Q, its general manager, and its staff if the hotel scored poorly on an inspection, guest surveys, or had complaints submitted by customers.

g. Wyndham required Krishna Q to report the hotel's gross room revenue to Wyndham every month through Wyndham's online reporting tool. Wyndham had the right to audit and retain copies of Krishna Q's financial information, including records and accounts relating to room revenue.

h. Wyndham required Krishna Q to allow Wyndham to inspect the subject hotel, including unannounced inspections, and this requirement was material to their agreement. Wyndham also required Krishna Q to allow it to conduct surveys of guests at the subject hotel.

i. Wyndham required Krishna Q to participate in Wyndham's Reservation System and use it exclusively. Wyndham did not allow Krishna Q to use any other system for handling reservations. Wyndham required Krishna Q to use the equipment it specified to do so.

j. Wyndham required Krishna Q to acquire the property management system technology that it specified and use that system. Wyndham

owned all of the information collected by Krishna Q in the property management system.

k. Upon information and belief, every time the trafficker checked in and renewed a room rental, that rental or renewal was entered into Wyndham's property management system, Wyndham's system recorded the one night rental and renewal pattern for years.

l. Wyndham owned all guest information from the subject hotel.

m. Wyndham handled guest complaints about the hotel and required Krishna Q to resolve them and expressly reserved the right to act on complaints posted on third party websites.

n. Wyndham required Krishna Q to agree that it would not allow its agents, employees, or guests to engage in illegal conduct.

83. Wyndham could terminate the Franchise Agreement if Krishna Q did anything that could hurt their brand or if Krishna Q operated the subject hotel in a way that endangered the safety of the guests.

84. These terms, and Wyndham's exercise of them, show that Wyndham reserved and exercised control over the manner in which the subject hotel was operated day-to-day, including how rooms were reserved, rented, priced, paid for, recorded, and reported; how the hotel's staff were trained; how guest complaints

and online reviews were handled; and whether the hotel's guests could engage in unlawful conduct on the premises.

85. Wyndham actually did inspect the subject hotel during the trafficking period multiple times. Upon information and belief, Wyndham inspected the subject hotel in 2017, and the subject hotel failed the inspection, so Wyndham came for another inspection that same year.

86. Upon information and belief, Wyndham also addressed around 23 guest complaints from the subject hotel between 2017 and 2019.

87. Upon information and belief, Wyndham retrained the subject hotel's staff in 2017 and charged Krishna Q for such training.

88. Wyndham also actually did audit Krishna Q's financial records in 2017.

89. Wyndham exercised this control in many ways, one of which is evidenced by the fact that it sent multiple letters to Krishna Q in 2017 and 2018 and advised Krishna Q that it was in default on payments and ultimately terminated the franchise agreement because of this default in late 2018.

**Wyndham Controlled the Specific Operations That Caused Plaintiff's Harm.**

90. Upon information and belief, during the relevant period, Wyndham also exercised control over the day-to-day operations of the subject hotel by,

among other things:

a. conducting quality assurance inspections and guest satisfaction surveys at the subject hotel, through which its representatives observed the hotel's operations, guests, and condition;

b. setting the policies governing check-in, identification of guests, payment methods, room rates, and the sale of rooms through third-party booking channels such as the website which the trafficker used to book rooms at the subject hotel;

c. controlling the content of the training required of the hotel's owners, managers, and staff, including whether that training addressed the signs of human trafficking, and failing to require such training;

d. collecting and monitoring guest complaints, guest satisfaction surveys, and online reviews of the subject hotel, and directing Krishna Q's response to them.

91. Wyndham had the power to require Krishna Q to stop guests from engaging in unlawful conduct and to terminate the franchise if Krishna Q operated the hotel in a manner that endangered its guests. Wyndham did not use that power to address the prostitution, pimping, and drug activity those reviews reported.

92. Wyndham's control thus extended to the specific aspects of the hotel's operation that caused Plaintiff's harm: the reservation, rental, and renewal of rooms; the acceptance of payment without identification of a minor guest; the training, or lack of training, of staff on the signs of trafficking; the response to guest complaints and online reviews; and the policies governing unlawful conduct by guests and unregistered visitors.

93. Plaintiff's trafficker booked the rooms, at times, through third-party websites. Upon information and belief, those bookings ran through Wyndham's required reservation system and distribution channels. Upon information and belief, Wyndham charged its distribution fees on those bookings and took the Plaintiff's trafficker's data.

94. Krishna Q, its owners, and its staff acted on Wyndham's behalf and subject to Wyndham's control in operating the subject hotel, and Wyndham accepted the benefits of their work, including its share of the revenue from every room rented to the trafficker. Krishna Q was therefore Wyndham's actual agent, and Wyndham is vicariously liable for the acts, omissions, and knowledge of Krishna Q and its owners and staff within the scope of that agency.

95. Many of the actions Krishna Q's staff engaged in that were in aid or recognition of the trafficker's efforts to cause Plaintiff to engage in commercial sex

happened when the staff interacted with the trafficker, plaintiff, and the other victims at the front desk as a part of renting the room or renewing the room rental. At times, the staff at the front desk would warn the trafficker of police activity when he attempted to check in. The staff would accept extra cash at check in as a part of the transaction of renting the room. The staff would also assign the trafficker rooms near the exits. These actions all took place at check in or during room renewal, which goes to the core of the operations governed by Wyndham's System Standards.

96. Wyndham also held the subject hotel out to the public as a "Days Inn by Wyndham," required Krishna Q to display Wyndham's marks on the property, listed and sold rooms at the hotel through its own websites and reservation system, and enrolled the hotel's guests in Wyndham Rewards, so that the public would believe the hotel was operated by or on behalf of Wyndham. Wyndham is also liable under principles of apparent agency.

**Wyndham Participated in the Venture and Knew or Should Have Known It Violated the TVPRA.**

97. Wyndham participated in the hotel operating venture described in paragraphs 41 through 44 by licensing its brand, setting and enforcing operating standards, providing reservation and property management systems, inspecting the

hotel, tracking reviews for the hotel, upon information and belief, collecting data from Wi-Fi use at the hotel, and collecting a share of the revenue from every room rental, including rooms rented to the trafficker.

98. Wyndham knew or should have known that the venture violated the TVPRA because of the industry knowledge described above, the online reviews of the subject hotel reporting prostitution, pimps, and drug activity, the police activity at the subject hotel, the information it collected through its reservation, property management, inspection, and reporting systems, and the knowledge of Krishna Q and its owners and staff, which is imputed to Wyndham as their principal.

99. Despite this knowledge, Wyndham continued to franchise the subject hotel to Krishna Q, continued to collect fees from room rentals there, and failed to require any meaningful anti-trafficking measures at the subject hotel.

## IX. PLAINTIFF'S INJURIES

100. As a direct and proximate result of Defendants' conduct, Plaintiff was sex trafficked, sexually exploited, and victimized repeatedly at the subject hotel.

101. Plaintiff has suffered and continues to suffer substantial physical, mental, emotional, psychiatric, and psychological injuries and economic damages as a result of being trafficked and sexually exploited at the subject hotel. Plaintiff has been diagnosed with post-traumatic stress disorder, major depressive disorder,

and anxiety, and has required ongoing mental health treatment.

102. Defendants, during the relevant period, could deny accommodation to or eject a guest for many reasons, including that the guest was visibly under the influence of drugs or alcohol, was believed to be using a hotel room for unlawful purposes, brought in unregistered guests, or was an adult accompanied by an unrelated minor. Defendants did not do so.

## X. CAUSES OF ACTION

### COUNT I
### BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595
### AGAINST DEFENDANT KRISHNA Q INVESTMENTS LLC

103. Plaintiff is a survivor of sex trafficking within the meaning of 18 U.S.C. § 1591 and is entitled to bring a civil action under 18 U.S.C. § 1595 against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

104. Krishna Q knowingly benefitted, financially and by receiving things of value, from participating in the ventures, as described in paragraphs 50 and 52 through 53.

105. Krishna Q participated in a venture to operate the subject hotel, taking part in a common undertaking involving risk and potential profit, as described in

paragraphs 41 through 44. The venture included Wyndham, Days Inns Worldwide, Krishna Q, and the owners, managers, staff, and employees of the subject hotel.

106. Krishna Q also participated in a venture with the trafficker, with whom it had a continuous business relationship and a direct association, as described in paragraphs 45 through 49. Krishna Q continually decided to renew that relationship by renting rooms to the trafficker day after day, for years.

107. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as described in paragraphs 54 through 60.

108. Krishna Q knew or should have known that the ventures violated 18 U.S.C. § 1591 because staff knew or were in reckless disregard of that fact, and because of the information described in paragraphs 61 through 80.

109. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the subject hotel.

## COUNT II
## BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595 AGAINST DEFENDANTS WYNDHAM HOTELS & RESORTS, INC. AND DAYS INNS WORLDWIDE, INC.

110. Plaintiff is a survivor of sex trafficking within the meaning of 18 U.S.C. § 1591 and is entitled to bring a civil action under 18 U.S.C. § 1595 against whoever knowingly benefits from participation in a venture that it knew or should

have known violated the TVPRA.

111. Wyndham and Days Inns Worldwide knowingly benefitted from participating in the hotel operating venture by receiving royalties, fees, and other revenue from the subject hotel, including from rooms rented to the trafficker in which Plaintiff was trafficked, and they received data from use of its systems, as described in paragraphs 51 through 53 and 97.

112. Wyndham and Days Inns Worldwide participated in the hotel operating venture, a common undertaking involving risk and potential profit, as described in paragraphs 41 through 44 and 97.

113. The venture violated 18 U.S.C. § 1591 as to Plaintiff, as described in paragraphs 54 through 60.

114. Wyndham and Days Inns Worldwide knew or should have known that the venture violated 18 U.S.C. § 1591 as to Plaintiff, as described in paragraphs 62 through 80 and 98.

115. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the subject hotel.

## COUNT III
## VICARIOUS LIABILITY UNDER 18 U.S.C. § 1595
## AGAINST DEFENDANTS WYNDHAM HOTELS & RESORTS, INC. AND DAYS INNS WORLDWIDE, INC.

116. Krishna Q, its owners, and its staff acted as the actual and apparent agents of Wyndham in operating the subject hotel, as described in paragraphs 81 through 96.

117. Wyndham and Days Inns Worldwide are vicariously liable for the TVPRA violations of their agent Krishna Q, and of Krishna Q's owners and staff, committed within the scope of that agency, as alleged in Count I.

118. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the subject hotel.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 2255 AGAINST ALL DEFENDANTS

119. Any person who, while a minor, "was a victim of a violation of section . . . 1591 . . . and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred." 18 U.S.C. § 2255(a).

120. Plaintiff was a minor when she was a victim of violations of 18 U.S.C. § 1591 at the subject hotel, including the violations committed by the ventures in which Defendants participated, as described above.

121. Plaintiff has suffered and will continue to suffer personal injury, including substantial physical, mental, emotional, psychiatric, and psychological injuries, as a result of those violations.

## COUNT V
## NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST ALL DEFENDANTS

122. Defendants, as the owner and operator of the subject hotel and as the franchisor that controlled its operations, owed Plaintiff, an invitee at the subject hotel, a duty to exercise ordinary care to keep the premises and approaches safe, including from the foreseeable criminal acts of third parties. O.C.G.A. § 51-3-1.

123. Defendants also owed Plaintiff, who was a minor and especially vulnerable, a duty to protect her from harm while she was on premises they owned, operated, and controlled, and a duty to act reasonably in light of the obvious signs that she was being sexually exploited.

124. Defendants breached their duties and were negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, the trafficker, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in their business;

f. by failing to require sex trafficking training;

g. by failing to recognize the signs that the trafficker was a sex trafficker and that Plaintiff was being sex trafficked;

h. by renting rooms to the trafficker, accepting his payments, and warning him of police activity;

i. by failing to report the trafficker to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, 344, and 371.

125. Sex trafficking at the subject hotel was foreseeable to Defendants because of the matters described above, including the trafficker's prior trafficking at the subject hotel, the online reviews reporting prostitution and pimps, and the police activity at the subject hotel.

126. As a direct and proximate result of Defendants' breaches of their duties, Plaintiff was injured and has suffered damages.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants on all counts, and award:

a. all available compensatory damages for the losses described above with respect to each cause of action;

b. past and future medical and mental health expenses, and the costs associated with past and future life care;

c. past and future emotional distress;

d. consequential and special damages;

e. all available noneconomic damages, including pain, suffering, and loss of enjoyment of life;

f. liquidated damages under 18 U.S.C. § 2255(a) in the alternative to actual damages;

g. disgorgement of profits obtained through unjust enrichment, and restitution;

h. all damages allowable under the TVPRA;

i. punitive damages with respect to each cause of action;

j. reasonable and recoverable attorney's fees;

k. the costs of this action;

l. pre-judgment and post-judgment interest; and

m. such other and further relief as the Court deems just and proper.

Dated: November 4, 2026

Respectfully submitted,

*/s/ Ashley Ventrillo*
Ashley Ventrillo (*Pro Hac Vice*)
Nathaniel L. Foote, Esq.(CPF# 2402231005)
Kelsie Overton, Esq. (*Pro Hac Vice*)
**ANDREOZZI + FOOTE**
4503 North Front Street
Harrisburg, PA 17110
(t) (717) 525-9124 | (f) (717) 525-9143
kelsie@vca.law
TeamD@vca.law
*Attorneys for Plaintiff T.F*

## DISCLOSURE OF USE OF ARTIFICAL INTELLIGENCE

This document was generated with the assistance of AI Tool, Claude. I hereby certify under penalty of perjury that, despite reliance on an AI tool, I have independently reviewed this document to confirm accuracy, legitimacy, and use of good and applicable law, pursuant to Rule 11 of the Federal Rules of Civil Procedure.

Date: November 4, 2026. *∕s∕ Ashley Ventrillo*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to all counsel of record.

*/s/ Ashley Ventrillo*